### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| RIK LINEBACK, Regional Director of the Twenty-fifth Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, | ) ) ) ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | CAUSE NO. 1:07-CV-144 |
| CHAUFFEURS, TEAMSTERS, AND HELPERS LOCAL UNION NO. 414 | ) ) ) | |
| Respondent. | ) ) | |

**OPINION**

The Petitioner, the National Labor Relations Board (NLRB), filed a petition for injunction pursuant to 29 U.S.C. § 160(*l*) on June 20, 2007. The NLRB seeks to enjoin the Respondent, Chauffeurs, Teamsters, and Helpers Local Union Number 414 ("Local 414"), from engaging in unlawful recognitional picketing of Fidler Inc., d/b/a Aggregate Industries – Central Region ("Aggregate"), until final disposition of the unfair labor practice charge. Having held an evidentiary hearing on the matter on July 3, 2007, and considered the arguments of the parties, the Court grants the petition for preliminary injunction.

**A.   Standard for Injunction Under 29 U.S.C. § 160(*l*) to Prevent Recognitional Picketing**

The parties agree on the standard that applies when determining whether an injunction should be issued pursuant to 29 U.S.C. § 160(*l*). Section 160(*l*) states:

> Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of . . . section 158(b)(7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has

       reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law . . . .

§ 160(*l*).

In applying § 160(*l*) to determine whether an injunction shall issue, a court makes a two-step inquiry. "[T]he district court must first analyze whether the regional director had reasonable cause to seek an injunction; second, the judge must apply the traditional test in equity to determine whether an injunction would be 'just and proper.'" *Kinney v. Int'l Union Operating Engineers, Local 150*, 994 F.2d 1271, 1277–78 (7th Cir. 1993).

In determining whether the regional director of the NLRB had reasonable cause to seek an injunction, the court looks only to whether "disputed issues could be resolved by the Board in favor of the regional director's position, and the regional director is given the benefit of the doubt." *Id.*

The traditional test in equity to determine whether an injunction would be just and proper has four prongs: (1) whether the petitioner has a reasonable likelihood of success on the merits; (2) whether the petitioner has an adequate remedy at law, or whether it would be irreparably harmed if the injunction does not issue; (3) whether the threatened injury to the petitioner outweighs the threatened harm an injunction would inflict on the respondent; and (4) whether the granting of a preliminary injunction serves the public interest. *Id.* at 1275.

The NLRB alleges that Local 414 is engaged in recognitional picketing, and seeks an injunction to stop it. Section 158(b)(7) states that recognitional picketing, that is, picketing for

2

the purpose of forcing an employer to recognize a labor organization, is an unlawful employment practice:

> It shall be an unfair labor practice for a labor organization or its agents—
> (7) to picket . . . any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:
>
>> (A) where the employer has lawfully recognized in accordance with this subchapter any other labor organization and a question concerning representation may not appropriately be raised under section 159(c) of this title,
>>
>> (B) where within the preceding twelve months a valid election under section 159(c) of this title has been conducted, or
>>
>> (C) where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing.

29 U.S.C. § 158(b)(7).

Following the standard for issuing an injunction pursuant to § 160(*l*), this Court must determine first, whether, giving the NLRB the benefit of the doubt, there are disputed issues that could be resolved by the Board in favor of the regional director's position that Local 414 is engaged in recognitional picketing, and second, whether an injunction to prohibit Local 414 from further picketing would be just and proper.

**B.     Facts Presented**

Aggregate produces building material, including ready-mix concrete. It has ten facilities throughout the state of Indiana, including facilities in Wolcotville, Angola, and Waterloo. It also owns facilities in other states, including Minnesota and Michigan. The Waterloo facility was purchased on April 2, 2007, when Aggregate bought the assets of Klink Concrete. Ready-mix

truck drivers at the Angola and Wolcotville facilities are represented by Local 414, which has a collective bargaining agreement ("CBA") with Aggregate. Six Angola employees and five Wolcotville employees are covered by the collective bargaining agreement. Angola had a seventh driver who had previously quit, and Aggregate had no plans to replace him. Wolcotville had a sixth driver who was promoted to management, and there were no plans to replace him. The five drivers at the newly purchased Waterloo facility had no history of collective bargaining. Waterloo is within the geographical jurisdiction of Local 414. Aggregate Industries also has agreements with other unions for its other Indiana facilities.

The CBA between Local 414 and Aggregate outlines the procedure when a grievance is filed. First, the aggrieved employee meets with management, and if unsuccessful, the union steward is brought in. The third step is a conference between the union representative, aggrieved employee, union steward, and management. The fourth step is referral of the dispute to a committee made up of two people selected by the union and two people selected by the employer. The fifth step states that, if the parties agree to arbitration, the committee will select a third party who will act as chairman of the committee. If the parties do not agree to arbitration, then either party has the right to use "all legal and economic recourse in support of their contention." (Prelim. Inj. Hr'g, July 3, 2007, Collective Bargaining Agreement, Pl. Ex. 1, 11–12.)

Local 414 states it has three grievances against Aggregate. The first grievance, number 23076, was filed on March 16, 2007. The 26076 grievance alleges that a supervisor at the Angola facility performed bargaining unit work on March 15, 2007. As described by the operations manager for the Northern Indiana Ready-Mix Division, Ron Huster, and on the grievance form, a vendor truck came to the facility carrying product around 10:10 a.m., and no drivers were present. Employee Michael Kunce was not to report to work until 12:00 p.m., and he was not called in early to unload the truck. Instead, the assistant manager used the forklift to

4

unload the truck. Huster testified that it took five minutes to unload the truck. Kunce claimed he should have been called in early to unload the truck and asked for two hours of pay.

On March 19, 2007, Ron Elliot, the union steward at Angola, and employees Kunce and Joe Coffman, met with Huster to discuss the 26076 grievance, and two other grievances, which were withdrawn. The 26076 grievance was not resolved.

On April 2, 2007, Huster, Local 414 Vice President George Gerdes, Elliott, and Kunce met to resolve the 26076 grievance, but were unable to do so. Huster testified that Gerdes wanted two hours of pay for Kunce to settle the grievance, but he declined. Aggregate took the position that the CBA allowed the facility to use a supervisor to unload or load a truck to continue business, or service a customer, when no driver was present. Local 414 took the position that it had been agreed during negotiations that non-bargaining unit workers could only do loader work if everybody was working and there was an emergency. Gerdes also testified that there was an agreement about loader seniority. However, on cross, Gerdes admitted that neither agreement was in the CBA, but said that such agreements were made orally during negotiations. Brown testified that she did not remember any such agreement. The relevant provision of the CBA states "The loader is not an assigned position. Under normal circumstances the loader will be operated by a driver. There may be occasions when a non-union employee will operate the loader to maintain business operations or service the customer." (Collective Bargaining Agreement 20.)

On April 4, 2007, after Local 414 learned that Aggregate purchased the Klink plant in Waterloo, it filed two grievances, 26198 and 26199. Grievance 26198 stated that Aggregate violated the CBA by not applying it to the Waterloo employees. Gerdes wrote a letter to Huster asking for information on the Waterloo employees so that he could determine their status.

Grievance 26199 states that Aggregate transferred one truck from the unionized facility at Angola to the non-unionized facility in Waterloo in violation of the CBA. Huster testified that

5

it was common to move equipment between facilities. He said that at the time the Waterloo plant was purchased, Aggregate had thirteen trucks sitting idle that were for sale, and that six were moved to Waterloo. No trucks were acquired when Aggregate purchased the Waterloo plant. The truck complained of in the grievance had been sitting idle in Angola due to a driver quitting. Huster said the driver who quit was not going to be replaced, and there was no other use for the truck. It was moved to Goshen for service, and then to Waterloo. Local 414's position was that Aggregate was reducing work for bargaining unit employees by sending Aggregate equipment to the Waterloo plant. Waterloo, Wolcotville, and Angola are closely situated so that Waterloo could service Wolcotville and Angola customers. The relevant CBA provision, entitled Transfer of Employer Title or Interest, states that "The Employer agrees that it will not rent, lease, sublease, or sell equipment to any firm, corporation, partnership, individual to defeat the provisions and terms of this Agreement." (Collective Bargaining Agreement 7.)

On April 6, 2007, Aggregate wrote a letter to Gerdes complaining that Local 414 was making unwanted visits and calls to Waterloo employees.

On April 20, 2007, Huster, Aggregate's human resource manager Cynthia Brown, and other Aggregate employees met with Gerdes and Dennis Arnold, president of Local 414. At the meeting, grievance 26076 was discussed, and Huster and Gerdes signed off on the grievance stating they were deadlocked. Aggregate insisted it did not violate the CBA and would not pay. They then discussed the 26199 grievance concerning the equipment transfer, but reached no agreement. They were also unable to reach a settlement on the 26198 grievance. Local 414 continued to argue that the Waterloo employees should be covered by the CBA. Brown testified that she told them that they could file a petition for unit clarification with the NLRB, but they did not do so. Brown said that after Gerdes reiterated that the Waterloo facility should be covered by the CBA, he pulled out a list that included all of the facilities that had Teamster contracts throughout the country, and began reading the list. Brown asked him why he was reading the list

6

of facilities, and he responded that they would find out. Huster testified that Brown mentioned arbitration, and Gerdes said they would not arbitrate but go directly to economic recourse. Gerdes then produced a piece of paper with all of Aggregate's regions that were represented by the Teamsters, and the number of employees in those regions. Brown asked how that was relevant, and Gerdes replied, "Oh you'll find out." (Prelim. Inj. Hr'g, July 3, 2007, Tr. 29.) Huster said that Gerdes did not say which grievances would be involved in his threatened economic action. Gerdes testified that after all the grievances had been discussed, Brown was ready to get a list of arbitrators, but that he told her the union was not willing to arbitrate the grievances. He said they would take economic action, and read a list of Aggregate owned plants represented by the Teamsters and said that he would do everything he could to picket those areas. Gerdes said he did this to let them know he was serious about the grievances.

On the same day, Huster wrote a letter to the union to confirm that the parties were deadlocked on the grievances and that the union was not planning to arbitrate any of the grievances. The letter advised that any economic action to further the dispute over grievance 26198 would be unlawful. Gerdes wrote back to say that Huster's letter failed to mention 23076, and stated that Local 414 could lawfully strike to obtain a remedy on grievances 23076 and 2199. He wrote that a strike could be avoided by providing the full remedy requested for those grievances, and that Local 414 reserved the right to take any necessary action regarding grievance 26198.

On April 23, 2007, Huster talked to Robert Warnock, the president of Local 364, the union that represents the unionized ready-mix facilities in Indiana not represented by Local 414. Warnock told Huster that 414 was going to picket all of the Ready Mix facilities. On April 24, Local 414 went on strike and began picketing. They picketed at all of the Indiana facilities except for the Klink facility in Waterloo and one other facility, and they carried signs saying "Local 414 On Strike Only Against Aggregate Industries." (Prelim. Inj. Hr'g, July 3, 2007,

photograph, Pl. Ex. 12.) All the drivers represented by Local 414 and Local 364 stopped working and picketed. Aggregate Industries hired 70 temporary drivers. Two days later, Local 364 workers returned to work. The workers at the Valparaiso asphalt facility, represented by Local 150, also went on strike and remain on strike. Picketing took place at two plants in Minnesota for two days, and picketing at three factories in Michigan, Kalamazoo, Battle Creek, and Chelsea, started on June 11 and is ongoing.

      Gerdes stated that the purpose of the strike does not include settling grievance 26198, and stated that if Aggregate settles grievances 26076 and 26199 as the union requests, the strike and picketing will stop. He went on to describe what he would do with regard to 26198 if the other grievances were settled: "I can do one of two things I suppose. I can strike again over that or I can file labor charges." (Prelim. Inj. Hr'g, July 3, 2007, Tr. 121.) His attorney then asked, "with the unfair labor practice charge and this hearing today in Federal Court, would it be fair to say that we would not—that you would not strike over grievance 26198?" (Prelim. Inj. Hr'g, July 3, 2007, Tr. 121.) Gerdes responded that he would not strike. On cross examination, he was asked whether it was true that he was willing to lose jobs for at least eleven of his employees and cause Aggregate to lose a million dollars over two hours of pay and the movement of one truck, and he said that he was. On redirect, Gerdes explained that the two grievances were important enough to justify the strike and picketing to prevent the erosion of the bargaining unit in Angola. He stated that those jobs would be lost if Aggregate continued to move equipment from Angola to Waterloo, or continued to use managers to do bargaining work.

      Gerdes testified that he talked to Brown and other Aggregate employees on the telephone and that they discussed again their positions on grievances 26199 and 26076. During the conversation, Gerdes said that the strike was not about the Waterloo employees.

      On May 9, Brown faxed a letter to Gerdes asking whether paying two hours of wages to Kunce would satisfy grievance 26076 and what Local 414's basis is for believing bargaining unit

employees were harmed by the transfer of one truck from Angola to Waterloo. The letter also asks how much money the union was seeking as a remedy.

Gerdes responded the next day, stating that to resolve grievance 26076, they sought 2 hours of wages for Kunce and an agreement to stop using non-bargaining unit employees to perform bargaining unit work. Gerdes testified that they added the request for an agreement that mangers would stop doing bargaining unit work because, by this time, he believed Aggregate managers would continue to do bargaining unit work and draw out the grievance process each time it happened. To resolve 26199, Local 414 asked Aggregate to stop use of Aggregate equipment at the Waterloo plant, and for damages for Local 414 employees who lost wages resulting from the transfer of equipment to Waterloo. Gerdes also asked for information regarding all equipment transferred to Waterloo, customer records, and employee work hours.

Aggregate wrote in a letter dated May 24, 2007, that Local 414's request for documents was too broad. Aggregate sent only the production records for the truck moved from Angola to Waterloo for April 2, 2007 to April 23, 2007.

Aggregate wrote to Local 414 on May 29, 2007, stating that they would pay two hours of wages to Kunce on a non-precedential basis, and that they would provide some of the information requested to a third party to examine the records. Aggregate did not agree to stop using non-bargaining employees to perform bargaining unit work, because it argued that in some circumstances, the CBA permitted them to do so. Aggregate also did not agree to move the truck back to Angola, because it would sit there unused. The union rejected the offer, and asked for additional information.

On June 22, 2007, Huster wrote another letter to Local 414. He included more production records for the truck transferred from Angola to Waterloo. He also complained of intimidation of replacement workers, including a car accident caused by a picketer, and asked that Local 414 take greater steps to control misbehavior. Gerdes responded on June 26, 2007, stating that

9

without the requested information concerning the truck, he could not determine what damage the bargaining unit suffered as a result of the truck being moved. Gerdes also testifed that he had no knowledge of any problems with violence and that Aggregate did not bring any problems to his attention.

Huster testified that because of the picketing, Aggregate shut down the Valparaiso plant and the Wolcotville plant. Huster stated that Aggregate would probably close the Valparaiso facility permanently. Picketers followed trucks to jobs, and Aggregate lost enough of those jobs to necessitate the closing of the Wolcotville plant. Customers, many of which were unionized, stopped buying asphalt from the Valparaiso plant, and so that plant closed. Bill Perry, Sales Manager for Aggregate, testified that Aggregate experienced a reduction in sales and a loss of customers. He listed several homebuilders that stopped purchasing with Aggregate totaling 3600 lost yards of concrete. He also said they lost projects with Brooks Construction, which was a very large customer, totaling 8000 lost yards. Chris West, Vice President and General Manager, testified that Aggregate lost $1,075,500 due to the labor dispute with Local 414. For the ready-mix facilities, $158,000 was due to lost volume, $253,000 for security, and $260,000 for temporary drivers. Security was hired for each ready-mix facility location, and for one manager's home. Temporary drivers were flown in, and they required training. Shutting down the Valparaiso plant and lost volume cost $270,000. Losses in the Michigan plants accounted for the remaining costs.

Huster testified that thirteen employees have also lost their jobs as a result of the strike. Aggregate hired permanent replacement workers for the drivers at Angola. Closing the Wolcottville facility caused five drivers to lose their jobs, and two jobs were lost at Valparaiso.

**C.    Analysis**

The parties agree that the main issue in dispute is the factual issue of whether a

motivation of Local 414's picketing is to force Aggregate Industries to recognize Local 414 as the representative of the Waterloo employees. If so, Local 414 is engaged in an unfair labor practice.

**1.      Reasonable Cause to Seek Injunction and Likelihood of Success on the Merits**

Because the questions of whether the regional director had reasonable cause to seek a preliminary injunction and whether the regional director is likely to prevail on the merits are similar, they may be considered together when there is "some likelihood of prevailing on the merits." *Int'l Union Operating Engineers, Local 150*, 994 F.2d at 1278 n.9. The court must find that the regional director's chances are "better than negligible" to issue the injunction. *Id.*

To succeed on the merits, Aggregate does not need to show that the sole purpose of the picketing was to obtain recognition of the union as representative for the Waterloo drivers; § 158(b)(7) makes it an unfair labor practice "to picket . . . any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees." § 158(b)(7). The evidence shows that it is fairly likely that the NLRB will find that an object of Local 414's picketing is to require Aggregate to recognize it as the representative of the Waterloo employees.

In this Court's view of the evidence, a factfinder has ample support to conclude that the purpose of the picketing is to bring the Waterloo drivers into the union. First, as soon as Local 414 discovered that Aggregate purchased the Waterloo plant, they filed the 26198 grievance, arguing that the CBA requires application of the contract to the Waterloo employees. At the April 20, 2007, meeting, after discussing the 26198 grievance, Gerdes pulled a list of Aggregate plants represented by the Teamsters and began reading them off. Asked what the relevance of his list was, he responded that they would find out. He said the union would use economic action in

11

response to the grievances, and would not agree to arbitrate any of them. Gerdes did not distinguish at that time which grievances were motivating the decision to use economic action. On April 23, Local 414 received a letter from Huster stating that any economic action in furtherance of the dispute over grievance 26198 would be considered unlawful and unprotected. Only then, in response to Huster's letter, did Gerdes state that the threatened economic action was only in response to grievances 26199 and 26076. The next day, the strike began.

Since then, Local 414 has taken no action in furtherance of grievance 26198; it has not filed a petition for unit clarification with the NRLB, and it has not sought arbitration. Local 414's failure to take any action on grievance 26198 makes it reasonable to infer that it is using the disputes over the other two grievances as a pretext to improve its bargaining position with regard to 26198. Local 414's examination of Gerdes suggests Local 414 was planning to sit on the grievance until the dispute over 26199 and 26076 was completed:

> Q. If the company settles grievances 23076 and 26199, as we have requested in the letters to them, what will happen with the picketing and the strike?
> A. It will stop.
> Q. The picketing will be over, the strike will end, correct?
> A. Yes.
> Q. If that occurs, what then will happen with grievance number 26198, the grievance that sought to apply the terms of the collective bargaining agreement to the Klink employees?
> A. Well, I would have a choice.  I either have to gather information that I've been refused so far, I can do one of two things I suppose.  I can strike again over that or I can file labor charges.  I would hope at some point, we would come to some sort of agreement.

(Prelim. Inj. Hr'g, July 3, 2007, Tr. 121.) If the current strike and picketing really were not motivated in any way by grievance 26198, then it would seem that Local 414 should be arbitrating or filing a petition with the NLRB as soon as possible. The only reason suggested as to why Local 414 cannot take action on 26198 is that they lack information, but Local 414 has not taken any action to obtain such information other than to write letters to Aggregate asking for more information.

12

Gerdes' testimony also suggests he had given little thought as to how he intended to deal with grievance 26198, other than by continuing to picket and strike. In a rather confused response to the question of how he would deal with 26198 when the strike was over, he stated that he could strike again, or file labor charges. His attorney quickly attempted to clarify by asking Gerdes if it would be fair to say that "we would not—that you would not strike over grievance 26198?" to which Gerdes said that he would not strike.

Also suggesting that Local 414 is motivated, at least in part, by 26198 is the weakness and relative insignificance of grievances 26076 and 26199. Until May 2007, when Local 414 increased its demands for settling grievance 26076 to include an agreement that Aggregate managers would no longer do bargaining unit work, the dispute involved only whether a manager violated the CBA by taking five minutes to unload a truck when there was a driver who was not at work, costing him at most 2 hours of wages. The union's position appears to be based on an alleged oral agreement that managers would not do such work unless all drivers were busy and there was an emergency. No such agreement is evidenced by any other testimony, or by anything Gerdes previously stated or wrote to Aggregated. Gerdes's testimony of a side agreement was uncorroborated.

The 26199 grievance claims that one truck that was driven at Angola was moved to Waterloo. The uncontested evidence is that trucks and drivers are regularly moved between facilities to where they are most needed. Local 414's allegation is that Aggregate moved a truck to defeat a provision of the CBA. Local 414's theory is that Aggregate left the union driver position at Angola that would use the truck unfilled, so that the truck was unused and could be moved to the non-unionized Waterloo plant. Presumably, the work the seventh Angola driver

13

would have done would be moved to the Waterloo plant. The loss of one truck by itself does not appear to be a major issue. Gerdes states that the issue was important because if equipment continued to be moved to Waterloo, Angola would continue to lose union jobs. The fact that non-unionized Waterloo could take union business is also a reason why Local 414 wants to represent Waterloo employees. The issues surrounding 26199 and 26198 are intertwined, and suggests the motivation of the strike goes beyond the movement of one truck.

 Local 414 argues that their signs, the fact no picketing occurred at the Waterloo plant, and Gerdes's April 23rd letter disavowing 26198 as a purpose of the strike prove that the purpose of the strike was not 26198. The Court disagrees. The pre-strike conduct strongly suggests that Local 414 had as a purpose of its strike and picketing obtaining representation of the Waterloo drivers. The writing of April 23rd letter, the use of the signs, and the choosing of locations to strike all occurred after Huster informed Local 414 that a strike would be unlawful.

 To engage in such widespread picketing and striking over the two grievances suggests Local 414 is seeking to accomplish more than it states. The six drivers at Angola have been permanently replaced and the Wolcotville and Valparaiso factories have shut down. It is difficult to understand why Local 414 would put their jobs at risk solely for these two issues, neither of which alone appears to be especially threatening to the union's position. Local 414 is either capriciously jeopardizing the livelihood of its members, or it is, at least in part, seeking to accomplish a more than it has admitted with its strike. In sum, the testimony of Gerdes, the lack of merit and significance of the other grievances, and the other evidence before the Court suggests that one reason for Local 414's striking and picketing is to obtain a satisfactory

14

settlement on grievance 26198. The Court finds that Aggregate is more likely than not to succeed on the merits of its charge against Local 414.

**2.    Adequate Legal Remedy / Irreparable Injury**

The evidence shows that Aggregate Industries has lost hundreds of thousands of dollars because of Local 414's striking and picketing, and will continue to do so if the conduct continues. Two facilities have been shut down because of Local 414's striking and picketing. Continuing this conduct could cause further shutdowns, loss of goodwill, permanent loss of customers and business, and layoffs. This is sufficient to show irreparable injury allowing the issuance of an injunction. *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005) ("[I]t is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'"); *Danielson v. Local 275, Laborers Int'l Union North Am.*, 479 F.2d 1033, 1036–37 (2d Cir. 1973) (holding that irreparable injury exists even if picketing does not shut down operation, but only delays performance, resulting in lost profits, because damage attributable specifically to union activity is difficult to measure).

**3.    Balancing the Threat of Harm to Aggregate Industries, the Threat of Harm to Local 414, and the Public Interest**

Once a petitioner shows a reasonable probability of success on the merits, irreparable harm and no adequate legal remedy, "the court then must consider any irreparable harm the preliminary injunction might impose upon [respondent] if the preliminary injunction is issued, and whether the preliminary injunction would harm or foster the public interest." *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 831 (7th Cir. 2002). This consideration involves determining the route that minimizes the risk of error:

> The court appraises the risk of irreparable harm to the parties not simply by

15

>reference to what they will lose by an unfavorable ruling today, but rather by reference to the harm of error: what irreparable harm would denial of a preliminary injunction cause to [petitioner] and the public if the trial reveals that [petitioner] is entitled to relief; and what irreparable harm will the granting of an injunction do to [respondent] and the public if the trial reveals that [petitioner] is not entitled to relief? Once those evaluations are made, the court balances likelihood of success and the risk of irreparable harm on a sliding scale: the better a party's chances of winning at trial, the less the balance of harms needs to favor that party.

*Id.* at 831. Therefore, the Court will determine what irreparable harm would be caused by erroneously denying the preliminary injunction and what irreparable harm would be caused by erroneously granting the preliminary injunction. The Court will then balance the likelihood of success and the risks of irreparable harm.

The irreparable harm that would be caused by erroneously denying an injunction would be a continued loss of customers and the possible permanent closure of one or more facilities. The harm to the public interest would be that those towns in which Aggregate facilities are located could potentially lose a business and the jobs and taxes that come with having the business located there. Also, the closure of Aggregate's facilities would harm the public's interest in a competitive market for concrete and asphalt products.

The irreparable harm that would be caused by erroneously granting the injunction would be much less. The union would be enjoined to stop its picketing and striking, weakening somewhat its ability to protect its members by using economic conduct. However, it would still have the options to arbitrate or file charges. Also, changes in circumstances could justify modifying an injunction. No possible harm to the public interest is claimed by Local 414. In any event, the Court is hard-pressed to see how the balance of harms could weigh in the union's favor. Aggregate and the public stand to lose far more by an incorrect decision by this Court than would Local 414.

Having found that there is a much greater possibility of irreparable harm to the public and to Aggregate from an incorrect decision, and having found that Aggregate has a better

16

chance than Local 414 of succeeding on the merits of its claim, the Court holds that a preliminary injunction is warranted in this case.

## ORDER

For the reasons stated, the NLRB's petition for injunctive relief is GRANTED.

It is ORDERED that pending final disposition of the matters pending before the National Labor Relations Board, an injunction is issued enjoining and ordering Respondent Chauffeurs, Teamsters, and Helpers Local Union No. 414, its officers, agents, servants, employees, attorneys, and all persons acting in concert or participation with it or them, as follows:

- A. Local 414 shall not in any manner or by any means picket Fidler, Inc., d/b/a Aggregate Industries–Central Region at any of Aggregate's facilities in the Court's jurisdiction or from ambulatory picketing of Aggregate's employees where, in either case, an object thereof is to force or require Aggregate to recognize and bargain with Local 414 as the representative of certain employees of Aggregate.

- B. Pending final Board adjudication, Local 414 is ordered to

    1) post copies of this Opinion and Order at its Fort Wayne, Indiana facility and at all locations where notices to employees customarily are posted, maintain said postings during the pendency of the Board's administrative proceedings free from all obstructions and defacements, and grant agents of the Board reasonable access to its facilities to monitor compliance with the posting requirement;

    2) within 20 days of the issuance of this Order, Local 414 must file with the Court and send to the Regional Director of the Board for Region 25 a sworn affidavit from a responsible official of Local 414 setting forth with specificity the manner in which Local 414 is complying with the terms of this decree.

When Local 414 has complied with this Order, and when the matters pending before the Board have reached disposition, the Petitioner will cause this proceeding to be dismissed.

SO ORDERED on July 13, 2007,

        /s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT